IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANITA SUFI, | No. C -13-01598(EDL) |
| Plaintiff, | **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CLAIM UNDER 42 U.S.C. § 1983 AND REMANDING TO STATE COURT** |
| v. | |
| LEADERSHIP HIGH SCHOOL, et al. | |
| Defendant. | |

**I.   Introduction**

Plaintiff Anita Sufi, formerly the principal of Leadership High School, a San Francisco charter school, alleges that she was subjected to adverse employment actions after she complained about employee health benefits applied disproportionately based upon race and the overwhelmingly white makeup of the school's Board of Trustees. Defendants Leadership High School, Elizabeth Rood, and Kevin Adams removed the case from state court and filed a motion to dismiss Plaintiff's sole federal claim of a violation of 42 U.S.C. § 1983, as well as other state law claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and whistleblower retaliation. Defendants also filed a Request for Judicial Notice ("RFN") to support their motion.

For the reasons stated below and at the hearing on June 18, 2013, the Court grants Defendants' motion to dismiss Plaintiff's section 1983 claim. Because that claim is the sole basis for federal jurisdiction, the Court remands the case back to state court pursuant to 28 U.S.C. § 1367(c)(3).

## II. Plaintiff's Allegations

Plaintiff, who is of Indian origin and identifies as a woman of color, was hired as principal of Leadership High School ("LHS"), a San Francisco public charter high school, on June 15, 2011. Compl. ¶¶ 2, 19. She was fired on January 10, 2013, after having been removed as principal on October 25, 2012. Compl. ¶¶ 33, 40. Plaintiff has named LHS as a defendant, along with Elizabeth Rood, LHS's Executive Director, and Kevin Adams, the Chairman of its Board of Directors. Compl. ¶¶ 6-8. Plaintiff's claims are: 1) breach of contract; 2) breach of the covenant of good faith and fair dealing; 3) race and national origin discrimination in violation of Government Code § 12940; 4) failure to prevent discrimination in violation of Government Code § 12940; 5) retaliation in violation of Government Code § 12940; 6) adverse employment action in violation of public policy; 7) retaliation for First Amendment conduct under 42 U.S.C. § 1983; and 8) retaliation based on whistleblowing in violation of Labor Code § 1102.5. Defendants seek to dismiss claims 1, 2, 7, and 8.

Plaintiff alleges that she has been an educator for twenty years, and trained at California State University, Fresno, and Mills College. Compl. ¶ 12. She claims that LHS offered her the Principal position at LHS, with an annual salary of $94,000 and full benefits, in exchange for leading the school and guiding it through two major milestones: the renewal of its accreditation with the Western Association of Schools and Colleges (WASC) and the renewal of its charter with the San Francisco Unified School District (SFUSD). Compl. ¶ 13. Plaintiff alleges that she successfully led LHS through the 2011-2012 school year, implementing programs to improve student achievement, addressing important security issues, and reducing student suspensions and expulsions. Compl. ¶ 15. Additionally, she claims that she helped convince WASC to renew LHS's accreditation, despite concerns raised in the review process, and helped convince SFUSD to renew the charter, even though the state charter school agency had recommended that the school be closed. Compl. ¶¶ 16-17.

Plaintiff alleges that on or about January of 2012, Defendant Rood asked Plaintiff to assist

United States District Court
For the Northern District of California

her in a meeting with the SFUSD superintendent because "it would help LHS for the Superintendent to see a principal who was a woman of color." Compl. ¶ 21. Defendant Rood wrote to Plaintiff, at the end of the 2011-2012 school year, that "[i]n honor of your dedication and hard work during the 2011-2012 school year, and in recognition of the difficult work you have taken on shifting the school's culture to one of greater professionalism and accountability for students and staff alike, I offer you a one-time incentive award of $3,000." Defendant Rood also thanked Plaintiff for "a job well done." Compl. ¶ 23. Plaintiff alleges that LHS renewed her contract for the 2012-2013 school year, with a salary of $96,000. Compl. ¶ 24.

Plaintiff alleges that her situation changed in July of 2012, when she spoke with LHS administrators and Defendant Adams, Chair of the Board of Directors, about a concern raised by staff: that health benefits were distributed unfairly and that white staff members received disproportionate benefits. Compl. ¶ 25. Specifically, Plaintiff alleges, according to LHS policy, a staff member should receive health benefits only if she worked 75% or more of a full-time position. However, two white staff members, including Defendant Rood, worked significantly less than 75% time and received full benefits, while a woman of color, also a staff member, worked 60% time and received no health benefits. Compl. ¶¶ 25-27. Plaintiff alleges that Defendant Rood worked as little as 20% time but received full benefits, including time when she was out on maternity leave. Compl. ¶¶ 26, 29.

At about the same time Plaintiff complained about the distribution of health benefits, she also complained to LHS officials, including Defendant Adams, about the ethnic composition of the school's Board of Directors: Plaintiff alleges that the Board was almost entirely white, while the student population was primarily African American and Latino. Compl. ¶ 30. Plaintiff alleges that Defendant Adams responded that "I am sorry for being white." Compl. ¶ 31. She states that she found this response insulting and told him that his comment mocked her real concerns about racial equity at the school. Compl. ¶ 32.

On October 25, 2012, Defendant Rood placed Plaintiff on administrative leave effective immediately, stating that Plaintiff's comments about the racial composition of the LHS Board had been "insubordinate." Compl. ¶ 33. Once she was placed on leave, Plaintiff allege that she recalled

3

earlier discriminatory comments from Defendant Rood, including describing a recently fired LHS staff member as a "quadruple threat" because she was a woman, black, lesbian, and had a history of mental illness, and commending herself for having fired the staff member without getting sued. Compl. ¶¶ 34-35. Plaintiff claims that Defendant Rood told an LHS student who jokingly commented that Rood and Plaintiff were dressed alike that "Ms. Sufi dresses much more masculine than I do." Compl. ¶ 36. Plaintiff further alleges that on or about February 2012, Defendant Rood told Plaintiff that she would never send her own child to LHS because her child was not an "urban" student. Compl. ¶ 37.

Plaintiff alleges that before Defendant Rood placed Plaintiff on leave, she claimed to conduct an investigation of Plaintiff's performance as a pretext for Plaintiff's termination. Compl. ¶ 38. The document that accompanied Plaintiff's involuntary leave outlined "serious concerns about Ms. Sufi's decision-making, communication, and actions." Compl. ¶ 39. Plaintiff maintains that Defendants were motivated to retaliate against her because she raised concerns about racial disparities at LHS. Plaintiff never returned to the position of Principal at LHS. She alleges that Defendant Rood assumed many of her former duties, and received increased compensation as a result. Compl. ¶¶ 40-41.

**III.     Legal Standard**

    **A.     Motion to Dismiss**

A complaint will survive a motion to dismiss if it contains "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007)). The reviewing court's "inquiry is limited to the allegations in the complaint, which are accepted as true and construed in the light most favorable to the plaintiff." Lazy Y Ranch LTD v. Behrens, 546 F.3d 580, 588 (9th Cir. 2008). A court need not, however, accept as true the complaint's "legal conclusions." Iqbal, 129 S. Ct. at 1949. "While legal conclusions can provide the framework of a complaint, they must

be supported by factual allegations." Id. at 1950. Thus, a reviewing court may begin "by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id.

### B.	Request for Judicial Notice

Under Federal Rule of Civil Procedure 201(b), a "judicially noticed fact must be one not subject to reasonable dispute in that it is either: (1) generally known within the territorial jurisdiction of the trial court; or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Furthermore, a court "shall take judicial notice if requested by a party and supplied with the necessary information." See Fed. R. Civ. P. 201(d); Mullis v. United States Bank, 828 F.2d 1385, 1388 n.9 (9th Cir. 1987). A court may also take judicial notice of matters of public record. Lee v. City of L.A., 250 F.3d 668, 689 (9th Cir. 2001).

## IV.	Discussion

### A.	Request for Judicial Notice

In support of their motion to dismiss, Defendants filed a request for judicial notice of publicly filed documents. Defendants' RFN includes excerpts from LHS's charter renewal petition, which was approved on February 14, 2012 (Declaration of Jennifer M. Lynch in Support of Defendants' Motion to Dismiss, hereafter "Lynch Decl." Ex. A) and LHS's Business Entity Detail on file with the California Secretary of State (Lynch Decl. Ex. B). Defendants note that Plaintiff refers to the LHS charter and its employee handbook in her Complaint. See Compl. ¶¶ 6 (alleging that LHS operates under a charter granted by SFUSD), 43 (alleging that the terms of Plaintiff's employment were governed by the employee handbook). The employee handbook is Appendix N to the charter renewal petition, Ex. A. Defendants argue that these materials are integral to the determination of Plaintiff's claims, and that the charter and its business entity detail are central to

5

the resolution of Plaintiff's section 1983 claims, because they relate to the corporate structure and organization of LHS. RFN at 3. Under United States v. Corinthian Colleges, 655 F.3d 984, 999 (9th Cir. 2011), courts may consider key documents relied on in a complaint but not attached to it.

Plaintiff objects to the Court's consideration of these documents. She maintains that the inclusion of the petition for charter renewal transforms the request for notice into a request to decide disputed facts, namely the level of independence and autonomy LHS maintains in relation to SFUSD. She also cites Corinthian Colleges: "[W]e may not, on the basis of evidence outside of the Complaint, take judicial notice of facts favorable to Defendants that could reasonably be disputed." 655 F.3d at 998-99. Plaintiff argues that the "issue of to what extent California maintains state control over its public charter schools, including LHS, is an issue of contested fact that is not properly subject to judicial notice." Objections, Docket No. 12, at 3. Plaintiff also argues that the document is a renewal petition, not the charter itself, and that Defendants have not proved that the charter was approved. Regarding Exhibit B, the business entity detail, Plaintiff argues that it establishes only that Defendant LHS is a corporation, and has no relevance as to whether LHS is a non-profit, tax-exempt entity under the Internal Revenue Code.

Defendants' reply seeks to remedy some of the issues raised by Plaintiff and dispel the others. First, as to Plaintiff's argument that the Court should not take notice of LHS's charter, Defendants argue that because Plaintiff relies on the charter and the employee handbook in her complaint, they are properly subject to judicial notice. In Corinthian Colleges, the Ninth Circuit held that judicial notice of unattached evidence on which the complaint necessarily relies is appropriate where: 1) the complaint refers to the document; 2) the document is central to the plaintiff's claim; and 3) no party questions the document's authenticity. 655 F.3d at 999. Defendants argue persuasively that Plaintiff expressly refers to and relies on the charter in her complaint (see Compl. ¶¶ 6, 43), and that she does not dispute what the charter says. RFN Reply at 2. Further, Defendants point out, the Court need not refer to the charter to determine LHS's independence and autonomy; rather, that dispute can be resolved through examination of the California Education Code and case law. Defendants also provide additional documentation to show that the renewal petition at Exhibit A of the Lynch Declaration is LHS's charter and that it was

6

1 approved on February 14, 2012. Supp. Lynch Decl. Ex. C, SFUSD Board Minutes from February
2 14, 2012. Defendants additionally provide both LHS's Corporate Statement of Information, which
3 states that LHS is a domestic nonprofit corporation (Supp. Lynch Decl. Ex. A), and its listing with
4 the IRS as an exempt organization (Supp Lynch Decl. Ex. B).

5 Plaintiff relies on the charter in her Complaint, and she does not dispute authenticity of the
6 documents. The Court hereby grants Defendants' RFN.

### B. First Amendment Retaliation Under Section 1983

10 Defendants' motion raises what appears to be an issue of first impression: whether the
11 directors and officers of a California incorporated nonprofit charter school, such as Defendant LHS,
12 are state actors within the scope of 42 U.S.C. § 1983. The purpose of section 1983 is to preclude
13 state actors from using their governmental authority to deprive people of their constitutional rights.
14 McDade v. West, 223 F.3d 1135, 1139 (9th Cir. 2000). Section 1983 does not protect plaintiffs
15 from private conduct. Am. Mfrs. Mut. Uns. Co. v. Sullivan, 526 U.S. 40, 50 (1999). Plaintiffs must
16 show that the conduct that allegedly caused the deprivation of a federal right is "fairly attributable to
17 the state." Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982). The burden is on the plaintiff to
18 show the close nexus between the state and the alleged action. Lee v. Katz, 276 F.3d 550, 553-54
19 (9th Cir. 2002).

20 Here, Plaintiff alleges that Defendants Rood and Adams, acting under color of state law in
21 their official capacities at LHS, a public charter school organized under California law, intentionally
22 violated Plaintiff's First Amendment rights. Compl. ¶¶ 60-62. Defendants rely on a recent Ninth
23 Circuit case, Caviness v. Horizon Community Learning Center, Inc., 590 F.3d 806 (2010), holding
24 that an Arizona charter school sued by a former teacher was not a state actor for section 1983
25 purposes. Plaintiff relies on a recent district court decision, Nampa Classical Academy v. Goesling,
26 714 F. Supp. 2d 1079 (D. Idaho 2010), holding that an Idaho charter school was part of the "state"
27 for purposes of acting as a plaintiff in a section 1983 case. The non-precedential Ninth Circuit
28 opinion affirming Nampa, Nampa Classical Academy v. Goesling, 447 Fed. Appx. 776, 778 n.1 (9th

7

Cir. 2011), distinguishes Caviness in a footnote. The dispute here turns on whether the California statutory scheme governing charter schools most resembles the charter school laws in Arizona or in Idaho with respect to charter schools' role as employers.

In Caviness, the district court sua sponte requested early briefing regarding the defendant charter school's status as a state actor and granted a motion to dismiss, rejecting the plaintiff's arguments that the school was a state actor because Arizona law characterized charter schools as "public schools" and because providing education is a public function. 590 F.3d at 810-11. The Ninth Circuit affirmed the dismissal, holding that where a private non-profit corporation runs a charter school that is defined as a public school by state law (as is the case in California as well as Arizona), the key question for the section 1983 analysis is "whether Horizon's role as an employer was state action." Id. at 813.

The court then delved into Arizona's statutory scheme for charter schools, which defines charter schools as "public schools" and provides public funding, although the schools are authorized to accept gifts and grants. 590 F.3d at 808-09. A private or public entity that wants to create a charter school must submit an application and become sponsored by a school district governing board, the state board of education, or the state board for charter schools. Id. The sponsoring entity retains oversight and administrative responsibility, but the school must develop a plan to run itself autonomously. Id. The court also noted that the Arizona charter schools are subject to certain state regulations relating to health, safety, civil rights, and insurance, and that charter schools are considered "political subdivisions" of Arizona such that they must comply with the state's Open Meetings Act. Id. Charter school employees may participate in the state retirement system. However, except as expressly specified in statute or the school's charter, Arizona charter schools are exempt from all other statutes and rules relating to schools, school boards, and school districts. Id.

The plaintiff in Caviness contended that under this structure, a charter school is a state actor for all purposes, including employment purposes. Id. at 813-14. He argued that the law characterized charter schools as public schools, that providing public education was a traditional state function, and that the state regulated personnel matters at charter schools by allowing employees to participate in the state retirement system. The court rejected all of these arguments.

8

1  Significantly, it noted that the statutory characterization of a charter school as a public actor for one
2  purpose did not resolve the question of whether the school was a public actor in the employment
3  context. Id. at 815-16. The personnel decisions at issue, the court held, turned on judgments made
4  by private parties that were not governed by state-established standards. Id. at 818.

5  Here, Defendants argue that the California statutory scheme governing charter schools is
6  virtually identical to that of Arizona. Mot. at 13. Charter schools in California, like those in
7  Arizona, are expressly defined as part of the public school system under California Education Code
8  § 47615(a)(1). As in Arizona, the chartering entity retains administrative oversight, but charter
9  schools operate independently from the public school district structure. Cal. Educ. Code §
10 47605(k)(2). California charter schools are publicly funded, but, like in Arizona, may receive funds
11 from other sources. Cal. Educ. Code §§ 47612, 47603. An organization seeking to establish a
12 charter school must petition for its establishment with a school district or the county or state board
13 of education. Cal. Educ. Code § 47605(j)(1). In Arizona, the charter school must be sponsored by a
14 school district, state board of education, or state charter school board. Ariz. Rev. Stat. § 15-183(C).
15 As in Arizona, California charter schools are subject to certain state laws and regulations, such as
16 statewide student assessments, and the state open meeting law. Cal. Educ. Code § 47605(c)(1); Cal.
17 Educ. Code § 47608; see Caviness, 590 F.3d at 809-10. As in Arizona, California charter school
18 employees are eligible to participate in the state retirement system. Cal. Educ. Code § 47611; see
19 Caviness, 590 F.3d at 809-10. Significantly, as in Arizona, California charter schools are exempt
20 from compliance with other laws governing school districts. Cal. Educ. Code § 47610.

21 Defendant LHS is a separately incorporated non-profit, a tax-exempt charity under section
22 501(c)(3) of the tax code. See Lynch Decl. Ex. A, LHS Charter Renewal Petition, at 53. Its charter
23 provides that it operates autonomously from the District, and that the District has no liability for
24 LHS's debts and obligations. Id. The charter also states that all employment disputes shall be
25 handled internally and that the school district will not be involved in such a dispute unless it relates
26 to a case for revocation of the charter. Id. at 80. Defendants maintain that this case arises in the
27 same employment context, and under almost the same statutory scheme, so the outcome here should
28 be the same as in Caviness.

1    Defendants also contend that California state case law suggests separately incorporated
2 charter schools such as LHS should be treated differently from traditional public schools.
3 Defendants cite Wells v. One2One Learning Foundation, where the California Supreme Court held
4 that charter schools organized as nonprofit corporations were subject to suit under the California
5 False Claims Act, but public school districts were not. 39 Cal. 4th 1164, 1199-1200 (2006). The
6 Court noted that California's false claims statute defined covered "persons" in a way that suggested
7 "an intent not to include government entities," Id. at 1198, whereas charter school defendants were
8 "persons" who might be liable under the law. Id. at 1199-1200. In Knapp v. Palisades Charter High
9 School, the California Court of Appeal held that a charter school organized as a nonprofit
10 corporation was not a "public entity" for purposes of the California Tort Claims Act, based on the
11 school's independent legal structure and its autonomy from the school district. 146 Cal. App. 4th
12 708, 710, 717-18 (2007).

13    Plaintiff counters that Defendants Rood and Adams, as officers of LHS, are state actors.
14 She relies on the district court opinion in Nampa Academy v. Goesling, 714 F. Supp. 2d 1079, 1088
15 (D. Idaho 2010), as well as the nonprecedential Ninth Circuit opinion affirming it, Nampa Classical
16 Academy v. Goesling, 447 Fed. Appx. 776, 2011 WL 3562954 (9th Cir. Aug. 15, 2011). Nampa
17 arises in a quite different context from Caviness and from this case. There, a charter school and
18 some of its teachers, parents, and students brought a suit under section 1983 against members of the
19 Idaho Public Charter School Commission, the state board of education, and other officials
20 challenging a policy that prohibited the use of religious materials in public school curricula. 714 F.
21 Supp. 2d at 1084. The school, whose founding principle called for the use of the Bible and other
22 primary sources as educational tools, argued that the policy violated the Establishment Clause of the
23 First Amendment. Id. at 1085. The Idaho Attorney General's office issued a legal opinion to the
24 Charter School Commission that the use of the Bible in the curriculum would violate the Idaho
25 constitution. Id. at 1086. The Commission so advised the school, and when the school proceeded
26 with the curriculum, the Commission issued notices of defect. Id.

27    The district court considered whether the school was a proper plaintiff for the section 1983
28 claims. Id. at 1088. It cited a recent Supreme Court opinion, Ysursa v. Pocatello Educ Ass'n, 555

10

U.S. 353, 363 (2009), which held that a "political subdivision . . . is a subordinate unit of government created by the State to carry out delegated governmental functions. . . . [A] political subdivision, 'created by the state for the better ordering of government, has no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator.'" 555 U.S. at 363 (internal citations omitted). The district court held that the charter school was such a political subdivision of the state under Idaho law: "it is created by the State and, therefore, has no privileges or immunities to invoke against the state. Idaho Code § 33-5204(1) ('a public charter school created pursuant to this chapter shall be deemed a governmental entity.')." 714 F. Supp. 2d at 1088. The Nampa Classical court held that the school cannot, as a matter of law, state a claim under section 1983 against the state. It distinguished Caviness, stating in a footnote that

> [i]n Arizona, charter schools are private entities that may contract with a district governing board or the state. This arrangement is different from Idaho where charter schools such as NCA are not private entities but are instead created by statute as part of the public education system and, therefore, have the same rights to sue and be sued as school districts. . . . Because charter schools in Idaho are part of the state's program of public education, which is a delegated governmental function, they are not 'persons' who can sue under § 1983.

714 F. Supp. 2d at 1088 n.11.

In a nonprecedential, unpublished opinion, the Ninth Circuit affirmed the district court's holding that the school was not a proper plaintiff for the section 1983 claims, explaining:

> While NCA itself is a private nonprofit corporation, Idaho law contains numerous provisions that, when taken as a whole, demonstrate that Idaho charter schools are governmental entities. See, e.g., Idaho Code § 33-5204(2) (*charter schools 'may sue or be sued . . . to the same extent and on the same conditions as a traditional public school district*"); § 33-5203(1); § 33-5204(1); 33-5208 (funding). Idaho charter schools are also subject to state control that weighs in favor of a finding that they are governmental entities. [citations omitted] Like other political subdivisions, Idaho charter schools are creatures of Idaho state law that are funded by the state, subject to the supervision and control of the state, and exist at the state's mercy. NCA is therefore a government entity incapable of bringing an action against the state.

Id. at 777-78 (emphasis added). The court added a footnote: "In these respects, Idaho law goes beyond Arizona law in characterizing charter schools as public. Compare Caviness v. Horizon Community Learning Center, Inc., 590 F.3d 806, 813-14 (9th Cir. 2010)." Id. at 778 n.1. Plaintiff relies heavily on both the district court and the appeals court opinions in Nampa Classical, and appeared, at the hearing, to equate the authority of the Ninth Circuit's opinions in Nampa Classical and Caviness. As the Court noted at the hearing, however, the Ninth Circuit specifically designated

11

its opinion affirming the district court's order in Nampa Classical as "not for publication" under Federal Rule of Appellate Procedure 32.1 and Ninth Circuit Rule 36-3. Those rules allow for the citation of unpublished dispositions and orders in briefs and opinions, but make clear that such unpublished orders are not precedent and do not bind lower courts. See Fed. R. App. Proc. 32.1; Ninth Cir. R. 36-3. Although the Court will treat the two opinions in Nampa Classical as persuasive as to the interplay of § 1983 standing and the Idaho charter school framework, only Caviness is binding authority.

Plaintiff maintains that the situation here is more akin to that in Nampa Classical Academy than to Caviness. She argues that California exerts the same degree of control over its charter schools as Idaho does: when the charter school system was established, "the Legislature announced its intent to maintain supervision and control over all of its public schools, including new charters." Opp. at 8, citing Cal. Educ. Code § 47601(f). However, nowhere in section 47601 do the words "supervision" or "control" appear. The preamble states that the legislature seeks to

> provide opportunities for teachers [and] parents . . . to establish and maintain schools that operate independently from the existing school district structure, as a method to accomplish all of the following . . . (f) Hold the schools established under this part accountable for meeting measurable pupil outcomes and provide the schools with a method to change from rule-based to performance-based accountability systems.

Cal. Educ. Code § 47601(f). This outcomes-based accountability is more limited than the supervision and control that Idaho exercises over its charter schools.

Plaintiff is correct that the charter schools in California are deemed part of the public school system (as they are in Arizona) and that the state does retain some control over charter schools. Plaintiff notes that California charter schools must permit at least one representative of the charter-granting school district to sit on its board and that the local district retains the duty to inspect each school, ensure compliance with reporting requirements, monitor its finances, and report to the Department of Education. See Cal. Educ. Code § 47604. Plaintiff also points to the Legislature's findings regarding charter schools in 1998. Cal. Educ. Code § 47615. The Legislature declared that charter schools were part of the public school system, that they were "under the jurisdiction of the Public School System and the exclusive control of the officers of the public schools, as provided in this part," and that the findings should be "liberally construed." Id. At the hearing, Plaintiff argued

12

1 that this scheme differed from Arizona's, where private entities contract with the state. Further,
2 Plaintiff argues, the charter application and renewal process involves the local district in a
3 substantive review of the charter school, and charter schools exist under the exclusive control of the
4 officers of the public schools "with regard to the appropriation of public moneys to be apportioned
5 to any charter school . . .." Cal. Educ. Code § 47612(a). Plaintiff points to a similar funding
6 provision in the Idaho statute, which the Ninth Circuit stated supported the finding that the charter
7 school was a governmental entity. 447 Fed. Appx. at 777.

8  Plaintiff does not, however, address the first Idaho code section relied upon by the Ninth
9 Circuit in its Nampa Classical opinion, Idaho Code § 33-5204(2), which states that charter schools
10 "may sue or be sued . . . to the same extent and on the same conditions as a traditional public school
11 district." This provision is a significant difference between the Idaho statutory scheme and that of
12 California, where there is no such specific allowance that charter schools may sue or be sued exactly
13 as public schools can be. That code section mattered in Nampa Classical because of the school's
14 position as a putative plaintiff. However, as the Ninth Circuit pointed out in its unpublished
15 affirmance, "Idaho law goes beyond Arizona law in characterizing charter schools as public." 447
16 Fed Appx. at 778 n.1. The Idaho code also specifically designates charter schools as "government
17 entit[ies]." Idaho Code § 33-5204(1). Neither California nor Arizona have this specific designation
18 for charter schools.

19  Plaintiff's arguments about the level of control and supervision that California exercises
20 over LHS are quite similar to those the Ninth Circuit rejected in Caviness. The Arizona statutory
21 scheme at issue there also stated that the sponsoring entity retains "oversight and administrative
22 responsibility" for the charter schools it sponsors and defines charter schools as "public schools."
23 590 F.3d at 808-09. The Arizona statutes cited in Caviness are very similar to those of California,
24 and although Plaintiff argues that the Idaho statutory scheme is a closer match, she has not drawn
25 any meaningful distinctions between the California code at issue here and the Arizona code in
26 Caviness.

27  Equally, if not more important, the district court in Nampa Classical did not analyze
28 whether a "close nexus" existed between the state and the specific conduct at issue there. See

13

1  Caviness, 590 F.3d at 812. As Caviness stressed, "an entity may be a State actor for some purposes
2  but not for others." Id. at 813 (internal citation and quotation omitted). In Nampa Classical, the
3  question was whether the charter school was a state entity or private actor for purposes of bringing
4  suit as a plaintiff against the state under section 1983. Here, as in Caviness, the issue is whether a
5  charter school is a state entity for purposes of being a defendant in a suit brought by its employee
6  over a termination decision. However strong California's regulation of charter schools may be in
7  other areas, its regulation of their employment practices is far lighter than that of the employment
8  practices at traditional public schools. In another case, relied on by the Caviness court, the 9th
9  Circuit held that a political subdivision of the state may not be a state actor for employment
10 purposes, where in the hiring and firing of its employees it acts as a private company, rather than in
11 a "governmental manner." Gorenc v. Salt River Project Agric. Improvement & Power Dist., 869
12 F.2d 503, 507 (9th Cir. 1989). LHS's charter specifically provides that all disputes between LHS
13 and its employees will be handled internally without school district involvement, unless they relate
14 to a cause for revocation of the school's charter. Lynch Decl. Ex. A at 80; see also Cal. Educ. Code
15 § 47604(c) (stating that the school district is not liable for the debts and obligations of the charter
16 school). Caviness is more on point than Nampa Classical, as well as precedential. Although she
17 tried valiantly, Plaintiff could not meaningfully distinguish Caviness in her opposition or at oral
18 argument.

19        Plaintiff also takes issue with Defendants' reliance on Wells v. One2One Learning
20 Foundation, 39 Cal. 4th 1164 (2006), and Knapp v. Palisades Charter High School, 146 Cal. App.
21 4th 708 (2007). She argues that Wells, which held that charter schools were subject to suit under the
22 state False Claims Act, actually endorsed subjecting charter schools to harsh financial penalties as
23 part of a policy to benefit students and the larger school system, and that such a policy would favor
24 holding charter school officials personally liable under section 1983. 39 Cal. 4th at 1202. Plaintiff
25 makes a similar policy argument regarding Knapp, which held that a student could sue a charter
26 school under the California Tort Claims Act without satisfying the claim presentation requirements.
27 146 Cal. App. 4th at 716-17. While the public policy rationale of Wells and Knapp may favor
28 holding individual defendants liable to protect the rights of students and teachers in public schools,

14

1 both cases distinguish public schools from charter schools in the application of state laws that
2 privilege public entities over private ones.

3 At the hearing, Plaintiff's counsel for the first time cited West v. Atkins, 487 U.S. 42
4 (1988), where the Supreme Court held that a physician under contract with a state-prison hospital
5 was acting under color of state law for purposes of section 1983 when he treated an inmate.
6 Specifically, Plaintiff's counsel directed the Court's attention to this language in West: "The
7 traditional definition of acting under color of state law requires that the defendant have exercised
8 power possessed by virtue of state law and made possible only because the wrongdoer is clothed
9 with the authority of state law." 487 U.S. at 49 (internal quotations and citations omitted). Plaintiff
10 argues that the Defendants are clothed with the authority of state law and only had the power to fire
11 her because of power made possible via state law. While it may be true that Defendants were in a
12 position to fire Plaintiff because a state statutory scheme made charter schools possible, that is too
13 attenuated a connection to make Defendants state actors, as Caviness makes clear.

14 The Court therefore grants Defendants motion to dismiss Plaintiff's section 1983 claim. As
15 noted above, the section 1983 claim is Plaintiff's only federal claim and was the sole basis for
16 Defendants' removal of the case from state court. Under 28 U.S.C. § 1367(a), a district court with
17 original jurisdiction over an action may exercise supplemental jurisdiction over all other claims that
18 are so related to the action that they form part of the same case or controversy under Article III of
19 the Constitution. A district court may decline to exercise that supplemental jurisdiction when it has
20 dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). In exercising
21 this discretion to remand a properly removed case to state court when no federal claim remains, a
22 district court examines whether the interests of judicial economy, comity, and convenience favor
23 remand for determination of the state law issues. See Harmston v. City & County of San Francisco,
24 627 F.3d 1273, 1276 (9th Cir. 2010). Here, Plaintiff's remaining employment claims are entirely
25 within the ambit of state law, she initially filed her complaint in state court, and the case is at a very
26 early stage. Judicial economy, comity, and convenience all point toward remand. Indeed, the
27 parties agreed at the hearing that a remand was appropriate. Having dismissed Plaintiff's single
28 federal claim, the Court hereby exercises its discretion under 28 U.S.C. § 1367(c)(3) and remands

this case to state court.

**IT IS SO ORDERED.**

Dated: July 1, 2013

*[signature]*

ELIZABETH D. LAPORTE
United States Chief Magistrate Judge